## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE CPI CARD GROUP INC.
SECURITIES LITIGATION

Case No. 16-cv-04531 (LAK)

**CONSOLIDATED CLASS ACTION
COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

Page

I.   NATURE AND SUMMARY OF THE ACTION ................................................................ 1

II.  JURISDICTION AND VENUE ......................................................................................... 3

III. THE PARTIES ................................................................................................................... 4

   A. Lead Plaintiff ............................................................................................................. 4

   B. Defendants .................................................................................................................. 5

      1.  Corporate Defendant .......................................................................................... 5

      2.  Individual and Executive Defendants ................................................................ 5

      3.  Tricor Fund Defendants ...................................................................................... 6

      4.  Underwriter Defendants ...................................................................................... 7

IV.  SUBSTANTIVE ALLEGATIONS .................................................................................... 9

   A. The Company's History and Business ........................................................................ 9

   B. EMV Cards ................................................................................................................ 11

   C. CPI's Sale of EMV Cards ......................................................................................... 14

   D. The Registration Statement and the IPO .................................................................. 18

   E. CPI's Registration Statement Contained Material
      Untrue Statements and Omitted Material Information .............................................. 19

      1.  The Registration Statement Failed to Disclose and
          Misrepresented Certain Material Adverse Trends
          and Uncertainties that Existed at the Time of the IPO ..................................... 21

      2.  The Registration Statement Failed to Disclose
          and Misrepresented Significant Risks that
          Made the IPO More Speculative and Risky ...................................................... 26

   F. Post-IPO Disclosures Reveal the Truth .................................................................... 32

V.   CLASS ACTION ALLEGATIONS ................................................................................. 35

VI.  CAUSES OF ACTION .................................................................................................... 36

COUNT I
FOR VIOLATIONS OF § 11 OF THE SECURITIES ACT
(Against the Company, the Individual Defendants, and the
Underwriter Defendants) ................................................................................................... 36

COUNT II
FOR VIOLATIONS OF § 15 OF THE SECURITIES ACT
(Against the Individual Defendants and the Tricor Fund Defendants)............................ 39

VII.  PRAYER FOR RELIEF .................................................................................................... 41

VIII. JURY TRIAL DEMANDED ............................................................................................. 42

Lead Plaintiff Alex Stewart, individually and on behalf of a class of similarly situated persons and entities, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.  Lead Plaintiffs' information and belief is based upon, among other things, the investigation undertaken by Court-appointed Lead Counsel, Labaton Sucharow LLP, which included review and analysis of (a) regulatory filings made by CPI Card Group Inc. ("CPI" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) public reports and news articles; (c) research reports by securities and financial analysts; (d) press releases, transcripts of earnings calls, and other public statements issued by and disseminated by the Company; (e) interviews with former CPI employees and other persons knowledgeable about CPI's business and industry; and (f) other publicly available material and data.  Lead Plaintiff believes that further substantial additional evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      The claims asserted herein are solely strict liability and negligence claims for violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") relating to CPI's October 8, 2015 initial public offering ("IPO") of 17.25 million shares of common stock at a price of $10 per share.  This federal securities class action is brought on behalf of a Class of all those who purchased or otherwise acquired CPI common stock pursuant and/or traceable to the Company's Registration Statement, as detailed herein, issued in connection with the IPO, and who were damaged thereby.

2.      Defendant CPI describes itself as a leading producer of financial payment cards, *i.e.*, credit and debit cards, with a 35% market share in the United States and "long-standing trust-based relationships" with its sprawling customer base.

3.      Leading up to the Company's IPO, CPI made "significant" investments in the production of a new generation of financial payment cards called "EMV" cards, or "chip cards."

4.      EMV stands for Europay, MasterCard, and Visa, the three companies that originally created the technical standard used for these cards.

5.      As further alleged below, EMV cards, which securely store data on integrated circuits, are rapidly replacing traditional magnetic stripe credit and debit cards.  CPI repeatedly touted at the time of the IPO that it was "well-positioned to capitalize on the U.S. market conversion to EMV."

6.      At the time of the IPO, as further alleged below, CPI reported rapidly increasing EMV card sales and earnings and appeared poised for continued growth.

7.      The Registration Statement did not disclose any current adverse trends affecting the Company and its EMV card sales at the time of the IPO.  However, by the time of the IPO, CPI's largest customers had become so overstocked with EMV cards that it would take months for them to work through millions of excess cards in their inventories, dramatically decreasing the Company's sales and profits in the quarters following the IPO.  Indeed, according to a former CPI inventory analyst, employees at the Company's Nashville facility had "piles" of excess cards sitting on their desks, and the Company had to expand its vaults in Nashville and elsewhere— just as the IPO was being launched—so that the millions of cards that were being produced but not sold could be securely stored.

8.      Investors were also unaware that small and midsize card issuers, which the Company would later describe as its "core" market segment and where the Company had its "highest market share," were not quickly adopting EMV technology, further diminishing demand for the Company's products.

9.     As the large issuers' inventory glut grew and small and midsize issuers did not adopt EMV technology, the Company faced undisclosed, increased pricing pressure and competition in its efforts to sell EMV cards.

10.    The first hint that something was wrong at CPI came only one month after the IPO, when the Company held its first earnings conference call as a public company and reported that there had been a "very modest pull forward" of EMV card orders "from the fourth quarter into the third quarter," meaning card orders that the Company expected to see in the fourth quarter occurred in the third quarter.

11.    This "very modest pull forward," however, was actually the tail end of a trend the Company had been facing throughout the first half of 2015.  As the Company would later reveal, CPI's large issuer customers had acquired, through increased purchases in *the months leading up to the IPO*, a glut of between 50 million to 100 million unissued EMV cards in their inventories.  Based on CPI's 35% market share and the Company's eventual disclosure that it would like take three months or more for the customers to use up their bloated inventories, the glut represented at least 23% to 47% of CPI's total EMV card sales in the first half of 2015.

12.    As a result of the massive glut and lack of demand for EMV cards, the Company reduced its fiscal year 2016 guidance and CPI's stock plummeted, falling from a price of $7.83 per share on May 11, 2016 to close at $4.01 per share on May 12, 2016.

13.    As of the commencement of this action, CPI common stock traded at $4.70 per share—53% less than the $10 per share IPO price.

## II.    <u>JURISDICTION AND VENUE</u>

14.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77*k* and 77*o*.  This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77*v*, and 28 U.S.C. § 1331.

15.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District, and one of the three co-lead book-running managers of the IPO (Goldman, Sachs & Co.) maintains its principal places of business in this District where it (along with the other two co-lead book-running managers) acted as representatives of the other Underwriter Defendants (as defined herein) in the IPO and conducted the IPO in large part.  CPI common stock was listed on the NASDAQ in connection with the IPO, which is located in this District.

16.     Moreover, in the underwriting agreement, Defendants CPI, Montross, Dreiling, Pearce, Tricor Fund IV, Tricor Fund IV US, and the Underwriter Defendants (each defined herein), all expressly and irrevocably submitted to the jurisdiction of this Court over any suit, action or proceeding arising out of or relating to the Registration Statement and the offering of stock in the IPO.

17.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   **THE PARTIES**

### A.   **Lead Plaintiff**

18.     As set forth in his Certification filed in this action on August 15, 2016 (ECF No. 71-1), Lead Plaintiff Alex Stewart purchased CPI common stock pursuant and/or traceable to the IPO and was damaged thereby.  On August 29, 2016, this Court appointed Alex Stewart as Lead Plaintiff in this action.

B.      **Defendants**

1.      **Corporate Defendant**

19.      Defendant CPI, together with its subsidiaries, engages in the design, production, data personalization, packaging, and fulfillment of financial payment cards (*e.g.*, credit and debit cards).  Defendant CPI is a Delaware corporation with its principal executive offices located at 10368 West Centennial Road, Littleton, Colorado.  The Company's stock is listed on the NASDAQ national market system under the ticker symbol "PMTS."

2.      **Individual and Executive Defendants**

20.      Defendant Steven Montross ("Montross") is, and was at the time of the IPO, President and Chief Executive Officer ("CEO") of CPI and a member of CPI's Board of Directors.  Defendant Montross sold 87,991 shares of CPI stock in the IPO, receiving approximately $835,914 in proceeds.

21.      Defendant David Brush ("Brush") is, and was at the time of the IPO, the Chief Financial Officer ("CFO") of CPI.

22.      Defendant Jerry Dreiling ("Dreiling") is, and was at the time of the IPO, a Vice President and Chief Accounting Officer of CPI.  Defendant Dreiling sold 19,941 shares of CPI stock in the IPO, receiving approximately $189,439 in proceeds.

23.      Defendant Bradley Seaman ("Seaman") is, and was at the time of the IPO, the Chairman of CPI's Board of Directors.

24.      Defendant Nicholas Peters ("Peters") is, and was at the time of the IPO, a member of CPI's Board of Directors.

25.      Defendant Robert Pearce ("Pearce") is, and was at the time of the IPO, a member of CPI's Board of Directors.  Defendant Pearce sold 22,758 shares of CPI stock in the IPO, receiving approximately $216,201 in proceeds.

26.    Defendant David Rowntree ("Rowntree") is, and was at the time of the IPO, a member of CPI's Board of Directors.

27.    Defendants Montross, Brush, Dreiling, Seaman, Peters, Pearce, and Rowntree are referred to collectively herein as the "Individual Defendants."  Defendants Montross, Brush, and Dreiling are sometimes referred to collectively herein as the "Executive Defendants."

28.    Each of the Individual Defendants signed the Registration Statement for the IPO. In addition, each of the Executive Defendants, in his capacity as a senior executive of CPI, reviewed, edited, and approved the Registration Statement as well as the IPO's roadshow PowerPoint presentation, talking points, and script.  Further, the Executive Defendant co-presented CPI's roadshow presentation to potential investors and presented highly favorable information about the Company, its operations, and its financial prospects.

### 3.    Tricor Fund Defendants

29.    Defendants Tricor Pacific Capital Partners (Fund IV), Limited Partnership ("Tricor Fund IV") and Tricor Pacific Capital Partners (Fund IV) US, Limited Partnership ("Tricor Fund IV US") owned 21.8 million shares, or 52.6%, and 12.9 million shares, or 31.1%, of CPI common stock, respectively, prior to the IPO.  Tricor Fund IV and Tricor Fund IV US are both managed by Defendant Tricor Pacific Capital, Inc. ("Tricor Pacific"), a private equity firm with offices in Lake Forest, Illinois and Vancouver, British Columbia.

30.    Tricor Pacific, Tricor Fund IV, and Tricor Fund IV US are referred to collectively herein as the "Tricor Fund Defendants."  The Tricor Fund Defendants collectively owned approximately 90.9% of CPI's outstanding preferred stock prior to the IPO.

31.    Defendants Seaman, Peters, and Rowntree, each of whom are officers or member of Tricor Pacific and served on CPI's Board of Directors at the discretion of Tricor Pacific, comprised three of the five members of CPI's Board at the time of the IPO.

32.     The Tricor Fund Defendants sold 1,899,605 shares of CPI in the IPO, receiving approximately $18 million in proceeds.  Following the IPO, the Tricor Fund Defendants continued to own approximately 57.5% of CPI common stock.  Also, according to the Registration Statement, CPI intended to use part of the IPO's proceeds to redeem the Tricor Fund Defendants' preferred stock for approximately $10.7 million.  That redemption has occurred.

33.     By virtue of their stock ownership and their designation of the majority of the members of the CPI Board, and stated in the Registration Statement, the Tricor Fund Defendants controlled CPI at the time of the IPO.

### 4.     Underwriter Defendants

34.     Defendants BMO Capital Markets Corp. ("BMO"); Goldman, Sachs & Co. ("Goldman Sachs"); CIBC World Markets Inc. ("CIBC"); Robert W. Baird & Co. Incorporated; William Blair & Company, L.L.C.; Raymond James & Associates, Inc.; Scotia Capital (USA) Inc. ("Scotia"); and Griffiths McBurney Corp. (collectively, the "Underwriter Defendants"), are investment banking firms that acted as underwriters in the IPO.

35.     Defendant CPI, the Individual Defendants, the Tricor Fund Defendants, and the Underwriter Defendants are referred to collectively herein as the "Defendants."

36.     Underwriter Defendants BMO, Goldman Sachs, and CIBC, served as the co-lead book-running managers and lead underwriters of the IPO.

37.     The Underwriter Defendants are investment banking houses which specialize, *inter alia*, in underwriting public offerings of securities.  They served as the underwriters of the IPO and shared more than $8.625 million in fees collectively.  Also, affiliates of CIBC and Scotia are limited partners in Tricor Fund IV, which, according to the Registration Statement, "may indirectly apply some of the proceeds [from the IPO] to make distributions to its limited partners" such as CIBC's and Scotia's affiliates.

38.     The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandise CPI stock in the IPO.  The Underwriter Defendants arranged a roadshow prior to the IPO during which they, and the Executive Defendants, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects.

39.     The Underwriter Defendants also demanded and obtained an agreement from CPI that CPI would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  They also made certain that CPI had purchased millions of dollars in directors' and officers' liability insurance.

40.     Representatives of the Underwriter Defendants assisted CPI, the Individual Defendants, and the Tricor Fund Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of CPI, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning CPI's operations and financial prospects.

41.     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with CPI's and the Tricor Fund Defendants' management, top executives (including the Executive Defendants), and outside counsel, and engaged in "drafting sessions" between at least May 2015 and October 2015.  During these sessions, understandings were reached as to:  (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which CPI stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about CPI would be

made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.

42.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Lead Plaintiff and the Class.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     The Company's History and Business

43.     CPI is a leading provider of comprehensive financial payment card solutions in North America with more than 20 years of experience in the financial payment card industry. Financial payment cards, as the Company defines them, are credit, debit, and prepaid debit cards issued on the networks of Visa, MasterCard, American Express, Discover, and Interac.  In 2014, the Company produced more than 360 million financial payment cards.  At the time of the IPO, CPI was the largest provider of financial payment cards in the United States, with a claimed market share of 35%.  As a market leader, CPI claims to have "long-standing trust-based relationships" with its "key customers and often deep process and technology integration."

44.     CPI operates in three segments:  U.S. Debit and Credit, U.S. Prepaid Debit, and U.K. Limited.

45.     The U.S. Debit and Credit segment produces financial payment cards and provides integrated card services to card-issuing banks in the United States.  Its products include EMV and non-EMV credit cards, debit cards, and prepaid debit cards issued on the networks of the payment card brands, as well as private label credit cards and instant issuance systems.  This segment also provides various integrated card services, including card personalization and fulfillment services, and instant issuance services.

46.     The U.S. Prepaid Debit segment primarily provides integrated card services comprising tamper-evident security packaging services, and card personalization and fulfillment services to prepaid debit card issuers in the United States.  This segment also produces financial payment cards issued on the networks of the payment card brands.

47.     The U.K. Limited segment primarily produces retail gift and loyalty cards for customers in the United Kingdom and Europe.  This segment also provides card personalization and fulfillment services.

48.     The Registration Statement touts CPI's leading market position, and attributes that position to the "long-term customer relationships" CPI developed over the last two decades.  CPI's customers are primarily leading national and regional banks, independent community banks, credit unions, managers of prepaid debit cards, group service providers, and card processers through field-based sales representatives in North America and Western Europe.

49.     The Company claims to have over 4,000 direct and indirect customers, including the majority of the top 20 U.S. debit and credit card issuers, *e.g.*, JPMorgan Chase, Bank of America, American Express, and Wells Fargo.

50.     CPI also claims to have the "#1 position in the highly attractive U.S. small issuer market, which includes independent community banks and credit unions."  CPI credits such customer relationships as being "driven by our strong relationships" as well as "capabilities and technologies."  In earnings conference calls after the IPO, the Company repeatedly reported that the small and midsize issuers represented the Company's "core" market segment and it was in that market segment that the Company had its "highest market share."

51.     As a leading producer of financial payment cards, CPI products include "EMV" cards (named after Europay, MasterCard, and Visa).

**B.**   **EMV Cards**

52.     EMV cards are "smart cards," also called "chip cards," which store their data on integrated circuits rather than magnetic stripes, although many EMV cards also have magnetic stripes for backward compatibility.



53.     EMV cards can be contact cards that must be physically inserted, or dipped, into a reader, or contactless cards (also known as Dual-Interface EMV cards) that can be read over a short distance using radio-frequency identification ("RFID") technology.  Payment cards that comply with the EMV standard are often called "chip-and-PIN" or "chip-and-signature" cards, depending on the exact authentication methods required to use them.  Most of the EMV cards that have been issued in the United States have been contact EMV cards.

54.     Until the introduction of EMV cards, all face-to-face credit or debit card transactions used a magnetic stripe or mechanical imprint to read and record account data, and a signature for verification.  Under that system, the customer would hand their card to the clerk at the point of sale, who would either "swipe" the card through a magnetic reader or make an imprint from the raised text of the card.  In the former case, the system would verify account details and print a slip for the customer to sign.  In the case of a mechanical imprint, the transaction details would be filled in and the customer would sign the imprinted slip.  In either

case, the clerk would verify that the customer's signature matched the signature on the back of the card in order to authenticate the transaction.

55.    The magnetic stripe and mechanical imprint systems had a number of security flaws.  Thieves could steal data by "reading" the magnetic stripe or learn to forge the signature on the card.  If someone were to steal the data in the magnetic stripe, that person could embed the stolen data in a different magnetic stripe, and then, after applying the new stripe to a different card, use the card to make fraudulent purchases.  New technology has also become available on the black market for both reading and writing the magnetic stripes, making cards easy to clone and use without the owner's knowledge.

56.    EMV cards, invented in the early 1990s, improve security against fraud compared to magnetic stripe card transactions that rely on the cardholder's signature and visual inspection of the card to check for features such as a hologram.  Unlike the static data in a magnetic stripe transaction, an EMV card transaction creates a dynamic code that is unique to that particular transaction, thereby diminishing the value of stolen card data.  Indeed, with EMV cards, account numbers and expiration dates are not actually transmitted between customer and merchant.  The chip creates a one-time code to fund a transaction—information useless to a thief trying to replicate cards.

57.    The United States is the last developed country to migrate to EMV technology, but that migration is currently underway.

58.    As the Registration Statement explained, "the conversion of U.S. Financial Payment Cards from magnetic stripe technology to ***EMV standard began in earnest in the second half of 2014 and is expected to continue over the next several years***, with the full adoption in the credit and traditional debit card markets largely completed by 2017 . . . .  [A]t the

end of 2014, only 7.3% of Financial Payment Cards in circulation in the United States were EMV-enabled."[1]

59.     According to the Registration Statement, a number of factors have led to the ongoing migration to the EMV standard:  (1) the "Liability Shift," (2) escalating card fraud in the United States and the enhanced security provided by EMV cards, (3) high-profile data breaches, and (4) desire for global interoperability of the payment systems.

60.     *Liability Shift.*  Banks and credit card issuers recently agreed to enact a "Liability Shift," which began on January 1, 2005 in the European Union and on October 1, 2015 (days before CPI's IPO) in the United States.  Previously, the card issuer was liable for financial losses due to fraudulent use of a card.  Now, pursuant to the Liability Shift, merchants are liable for any fraud that results from transactions on systems that are not EMV-capable, ***if the issuer had issued EMV-capable cards to its customers*** and the merchant had not yet adopted EMV technology.  The Liability Shift was put into place to induce both issuers and merchants to rapidly adopt EMV technology.

61.     *Escalating Card Fraud and Enhanced Security.*  There has been escalating credit card fraud in the United States in recent years.  Indeed, according to The Nilson Report, a newsletter focused on financial payment card industry statistics, the United States represents about one half of global financial payment card and private label credit card fraudulent transactions, despite accounting for only about one quarter of total card transactions.  This increase in fraudulent activity precipitated an increased conversion to EMV cards because, as discussed above, EMV cards feature an embedded microprocessor that, when paired with an EMV payment terminal, dynamically authenticates cardholder debit and credit card transactions

---

[1]     Emphases in quotations in this Complaint are added unless otherwise noted.

using a cryptographic process that results in a significantly more secure payment transaction environment.  Credit card fraud has declined significantly in nations that have adopted the EMV standard.

62.     ***High-Profile Data Breaches.***  A number of large U.S. merchants and banks have reported major customer or client data breaches and other related fraudulent activity in recent years, which have heightened awareness of data security and increased demand for higher security solutions in payments systems, including accelerating the adoption of EMV.

63.     ***Global Interoperability.***  EMV technology is increasingly becoming the global standard for financial payment cards around the world.  The coordinated efforts of banks and card issuers to implement the Liability Shift in the United States reflect, in part, their desire to standardize payment systems technology globally to ensure cardholders' cards will be accepted by merchants anywhere on their global network and to provide a predictable and consistent experience for the cardholder.

### C.     CPI's Sale of EMV Cards

64.     According to CPI, "as a leading provider" of debit and credit cards in the United States, the Company was "well-positioned to capitalize on the U.S. market conversion to EMV" cards.  Indeed, before the IPO, CPI "made significant investments in [its] physical infrastructure and equipment platform to prepare for the EMV conversion."  These investments included "opening a dedicated EMV technology center in Colorado for EMV production and personalization," as well as "significant information technology, human capital and equipment upgrades across [its] network of facilities."

65.     According to Confidential Witness 1 ("CW1"), who was an inventory analyst at the Company from August 2015 through March 2016, the Colorado EMV facility only had "very small scale" personalization—the process through which blank EMV cards are printed on and

finished—capabilities, so EMV cards had to be shipped to personalization and fulfilment facilities, like the one in Nashville, Tennessee where CW1 worked.

66.     Not only did CPI claim that it was "well-positioned to capitalize on" the EMV conversion, the Company touted astounding growth in sales and revenue of EMV cards leading up to the IPO.

67.     CPI had excellent visibility into sales data for EMV cards.  CPI used a robust "enterprise resource planning" software system called Monarch that provided CPI's management with instant access to and clear visibility of production schedules, order information, shipping information, and inventory levels from each of its facilities.  CPI's management also pulled this data from Monarch into another piece of software called Crystal Reports that would then generate company-wide reports.

68.     For the twelve months ending June 30, 2015, EMV cards represented 37% of CPI's net sales.

69.     The growth in the EMV market was so critical to CPI and investors in its IPO that the Registration Statement expressly broke down the number of EMV cards CPI shipped since 2012:

| Other Data: | Six Months Ended June 30, | | Twelve Months Ended June 30, | Year Ended December 31, | | |
| | 2015 | 2014 | 2015 | 2014 | 2013 | 2012 |
| | | | (in thousands) | | | |
| Financial Payment Card Shipments | | | | | | |
| EMV | 75,164 | 13,921 | 125,088 | 63,845 | 6,769 | 5,015 |
| Non-EMV | 111,240 | 157,018 | 251,607 | 297,385 | 297,862 | 323,817 |
| Total | 186,404 | 170,939 | 376,695 | 361,230 | 304,631 | 328,832 |

70.     This data illustrated amazing growth, including the shipment of almost as many EMV cards in the first six months of 2015 as in all of 2014, 2013, and 2012 combined, which

appeared in line with CPI's discussion of the opportunity the EMV conversion presented and their leading market position to capitalize on that opportunity:



71.     The "shipment" data was important because CPI generally recognizes revenue related to sales of its products immediately upon shipment, except where it has entered into "bill and hold" arrangements with a customer.

72.     In comparing results of operation for the six months ended June 30, 2015 with the six months ended June 30, 2014, *CPI's net sales of products increased $53.8 million, or 91.4%, and net income increased $17.5 million, or an astounding 2,190.9%*:

| | Six Months Ended June 30, | | | |
| | 2015 | 2014 | $ Change | % Change |
| | | | (dollars in thousands) | |
| Net sales: | | | | |
| Products | $ 112,771 | $ 58,905 | $ 53,866 | 91.4% |
| Services | 60,075 | 36,862 | 23,213 | 63.0% |
| Total net sales | 172,846 | 95,767 | 77,079 | 80.5% |
| Cost of sales | 111,503 | 69,969 | 41,534 | 59.4% |
| Gross profit | 61,343 | 25,798 | 35,545 | 137.8% |
| Operating expenses | 29,959 | 16,262 | 13,697 | 84.2% |
| Income from operations | 31,384 | 9,536 | 21,848 | 229.1% |
| Other income (expense): | | | | |
| Interest, net | (3,505) | (3,444) | (61) | 1.8% |
| Foreign currency gain (loss) | 149 | (211) | 360 | (170.6)% |
| Other income | 61 | 19 | 42 | 221.1% |
| Income before taxes | 28,089 | 5,900 | 22,189 | 376.1% |
| Provision for income taxes | (9,974) | (2,334) | (7,640) | 327.3% |
| Net income from continuing operations | 18,115 | 3,566 | 14,549 | 407.9% |
| Loss from discontinued operations, net of taxes | (606) | (2,763) | 2,157 | 78.1% |
| Gain on sale of discontinued operations, net of taxes | 887 | — | 887 | — |
| Net income | $ 18,396 | $ 803 | $ 17,593 | 2,190.9% |

73.     For the same period, net sales of products for the U.S. Debt and Credit segment for the six months ended June 30, 2015 increased $56.4 million, or 120.8%.

| | Six Months Ended June 30, | | | |
| | 2015 | 2014 | $ Change | % Change |
| | | | (dollars in thousands) | |
| Net sales by segment: | | | | |
| U.S Debit and Credit segment—Products | $ 103,161 | $ 46,727 | $ 56,434 | 120.8% |
| U.S Debit and Credit segment—Services | 20,244 | 2,543 | 17,701 | 696.1% |
| U.S Debit and Credit segment—Total | 123,405 | 49,270 | 74,135 | 150.5% |
| | | | | |
| U.S. Prepaid Debit segment—Products | — | — | — | — |
| U.S. Prepaid Debit segment—Services | 29,823 | 23,298 | 6,525 | 28.0% |
| U.S. Prepaid Debit segment—Total | 29,823 | 23,298 | 6,525 | 28.0% |
| | | | | |
| U.K. Limited segment—Products | 9,231 | 11,142 | (1,911) | (17.2)% |
| U.K. Limited segment—Services | 4,687 | 5,188 | (501) | (9.7)% |
| U.K. Limited segment—Total | 13,918 | 16,330 | (2,412) | (14.8)% |
| | | | | |
| Other—Products | 4,818 | 5,177 | (359) | (6.9)% |
| Other—Services | 5,104 | 6,006 | (902) | (15.0)% |
| Other—Total | 9,922 | 11,183 | (1,261) | (11.3)% |
| Inter-company eliminations | (4,222) | (4,314) | 92 | (2.1)% |
| Total | $ 172,846 | $ 95,767 | $ 77,079 | 80.5% |

74.     CPI noted in the Registration Statement that the "increase in net sales was driven by an increase in EMV related revenue."

75.     "Increases in gross profit were [also] driven by the increased level of net sales" as gross profit increased by 217.7% in CPI's U.S. Debit and Credit segment in the six months ended June 30, 2015:

| | Six Months Ended June 30, | | | | | |
| | 2015 | % of net sales | 2014 | % of net sales (dollars in thousands) | $ Change | % Change |
|---|---|---|---|---|---|---|
| **Gross profit by segment:** | | | | | | |
| U.S Debit and Credit segment | $ 45,307 | 36.7% | $ 14,260 | 28.9% | $ 31,047 | 217.7% |
| U.S. Prepaid Debit segment | 11,297 | 37.9% | 7,078 | 30.4% | 4,219 | 59.6% |
| U.K. Limited segment | 3,368 | 24.2% | 3,375 | 20.7% | (7) | (0.2)% |
| Other | 1,371 | 24.1% | 1,085 | 15.8% | 286 | 26.4% |
| Total | $ 61,343 | 35.5% | $ 25,798 | 26.9% | $ 35,545 | 137.8% |

76.     While all of these rapidly rising metrics demonstrated to the investing public that CPI was "well-positioned to capitalize on the U.S. market conversion to EMV" and was doing so after its "significant investments," Defendants omitted to disclose and misrepresented, as further alleged below, that material adverse trends had already developed that would put an end to CPI's growth story.

**D.      The Registration Statement and the IPO**

77.     On or about May 14, 2015, CPI filed with the SEC its registration statement on Form S-1 (Registration No. 333- 206218), which, following several amendments made in response to comments received from the SEC, was declared effective by the SEC on October 8, 2015 (the "Form S-1").

78.     On or about October 8, 2015, one week after EMV Liability Shift went into effect in the United States, the Defendants priced the IPO at $10 per share.

79.     On October 9, 2015, CPI and the Underwriter Defendants filed with the SEC the final prospectus for the IPO (the "Prospectus"), which forms part of the Registration Statement (the Prospectus and Form S-1, as amended, are referred to collectively herein as the "Registration Statement"), and sold 17.25 million shares of CPI common stock to the investing public, 15 million of which CPI issued and sold and another 2.25 million which were sold by

certain stockholders including the Tricor Fund Defendants and Defendants Montross, Pearce, and Dreiling.

      **E.**    **CPI's Registration Statement Contained Material
              Untrue Statements and Omitted Material Information**

80.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

81.    Specifically, the Registration Statement failed to disclose that, at the time of the IPO, CPI's largest customers for EMV cards were significantly over-inventoried because during the first half of 2015 they purchased significantly more cards than they were issuing.  In light of CPI's market share, and the Company's later admission that the glut of 50 million to 100 million unissued EMV cards represented at least three months' worth of demand, the over accumulation represented about an entire quarter's worth of CPI's EMV card orders.  As a result, the spectacular rise in sales CPI reported in the Registration Statement was coming to an end and CPI's largest customers significantly reduced their purchases in the fourth quarter 2015, ending December 31, 2015 (the remainder of the fiscal year 2015), and fiscal year 2016 as they worked through their bloated inventories.

82.    CW1—an inventory analyst at CPI during the months immediately before and after the IPO—worked at the Company's Nashville, Tennessee personalization and fulfillment center.  In Nashville, CW1 witnessed CPI's rapid over accumulation of unsold EMV cards first-hand.

83.    According to CW1, the Nashville facility did not physically make financial payment cards; rather it received shipments of blank cards from other facilities, such as the EMV

production center in Colorado.  The machines in Nashville would then print information onto the blank cards, in other words, "personalize" them.

84.     CW1 explained that, before the IPO, "millions upon millions" of unsold cards, about half of which were EMV cards, were accumulating at the Nashville facility.  While these unsold cards needed to be stored in a secure vault because they could be made into any credit card, according to CW1, the growing glut of unsold cards resulted in employees having piles of cards lying on their desks.

85.     Indeed, according to CW1, in October 2015—just as the Company was launching its IPO—the Nashville vault had to be expanded an additional 3,000 square feet to accommodate this growing glut of unsold inventory.  CW1 also explained that all of CPI's locations had more cards than they need, that those cards could not be sold, and, as a result, they sat in CPI's vaults at each location.  Thus, according to CW1, in October 2015, CPI's other locations were also expanding their vaults to accommodate the Company's overproduction.

86.     CW1 stated that, given the inventory buildup, it was pretty obvious that cards were being overproduced during this time period:  "The amount of cards that [Nashville] sent out versus the amount of cards that were coming in [to the Nashville facility] didn't match up."

87.     The "millions upon millions" of unsold cards accumulating in CPI's facilities at the time of the IPO provided the Defendants with ample evidence that there was a massive glut of EMV cards and that demand for EMV cards had evaporated and would continue to diminish after their touted increase in sales earlier that year.

88.     In addition to the growing glut of unissued EMV cards, the Registration Statement also failed to disclose that, at the time of IPO, small and midsize card issuers were not rapidly adopting EMV card technology.  As a result, there was, and would be for considerable

time, little demand for EMV cards in the Company's "core" market segment and "highest" market share.

89.     Further, the Registration Statement failed to disclose that, at the time of the IPO, as a result of decreased EMV card demand from overstocked large issuer customers and lack of demand from small and midsize market customers that were not adopting EMV technology, CPI was facing increased pricing pressure and competition in connection with obtaining EMV card orders.

90.     At the time of the IPO, CPI's business was experience each of these material adverse trends, uncertainties, and significant risks, and each was reasonably likely to have a material impact on CPI's continuing operations and future results.  Therefore, they were required to be disclosed in the Registration Statement.

### 1.     The Registration Statement Failed to Disclose and Misrepresented Certain Material Adverse Trends and Uncertainties that Existed at the Time of the IPO

91.     Under instructions to Form S-1, CPI was required to comply with Item 303 of Regulation S-K, 17 C.F.R. § 229.303 ("Item 303").  Specifically, Item 303, and the SEC's related interpretive releases thereto, requires issuers to disclose events or uncertainties, including any known trends that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.

92.     Moreover, pursuant to SEC Regulation C, CPI was required to disclose material information necessary to ensure that representations in the Registration Statement were not misleading.  Specifically, Rule 408, 17 C.F.R. § 230.408(a), states that "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading."

93.     In violation of these rules, the Registration Statement failed to disclose and misrepresented known materially adverse trends and uncertainties and failed to disclose material information that was necessary to make statement in the Registration Statement not misleading.

94.     The Registration Statement represented that CPI had a "[l]eading [m]arket [p]osition with Long-Term Customer Relationships" and noted that CPI "often" has a "deep process and technology integration" with certain of its customers.  The Registration Statement stated, in pertinent part, as follows:

> *Leading Market Position with Long-Term Customer Relationships.  **We estimate that we produce approximately 35% of all Financial Payment Cards in the United States, which we believe gives us the #1 market position by unit volume. We are a trusted partner across the markets we serve** and believe we have the #1 position in the U.S. prepaid debit market (which represents the fastest growing subset of the Financial Payment Card market in the United States), serving the top five U.S. Prepaid Debit Card program managers, a leading position in the U.S. large issuer market, serving the majority of the top 20 U.S. debit and credit card issuers, and **the #1 position in the highly attractive U.S. small issuer market, which includes independent community banks and credit unions, driven by our strong relationships, capabilities and technologies.  As a market leader, CPI has long-standing trust-based relationships with our key customers and often deep process and technology integration**, particularly in the case of customer who utilize our card services and instant issuance systems and services.  The solutions that we provide require strict data integrity, and generally card issuers are reluctant to switch away from trusted providers due to the requirements for high-security and access to highly-sensitive cardholder information.  As a result, our customers are selective about the partners with which they work and typically seek out partners who have a well-established reputation for trust and quality and are able to meet their service requirements.*
>
> We serve a diverse set of over 4,000 direct and indirect customers, including many of the largest North American issuers of debit and credit cards such as JPMorgan Chase, Bank of America, American Express and Wells Fargo, as well as the largest global managers of Prepaid Debit Card programs, including InComm, Green Dot, Blackhawk Network and American Express.  **We have long-standing relationships with our customers, many of whom we have served for decades and provide a differentiated level of service.**  We also maintain important relationships with the Payment Card Brands to ensure our facilities and processes consistently meet their standards.

95.     The Registration Statement provided CPI financial results for the first six months of 2015 and for year ended December 31, 2014, stating, in pertinent part, as follows:

> For the six months ended June 30, 2015, we generated net sales of $172.8 million, ***which represented an increase of 80.5% as compared to the six months ended June 30, 2014***, net income from continuing operations of $18.1 million, ***which represented an increase of 408.0% compared to the six months ended June 30, 2014*** and Adjusted EBITDA of $41.9 million, ***which represented an increase of 183.6% compared to the six months ended June 30, 2014***, representing net income from continuing operations and Adjusted EBITDA margins of 10.5% and 24.2%, respectively.  For the year ended December 31, 2014, we generated $261.0 million of net sales, ***which represented an increase of 32.9% as compared to the prior year***, $16.0 million of net income from continuing operations, ***which represented an increase of 42% as compared to the prior year***, and $54.2 million of Adjusted EBITDA, ***which represented an increase of 41.3% as compared to the prior year***, and net income from continuing operations and Adjusted EBITDA margins of 6.1% and 20.8%, respectively.

96.     The Registration Statement contained a section entitled **"Trends and Key Factors Affecting our Financial Performance."**  Under the subheading *EMV Conversion in the United States*, the Registration Statement highlighted CPI's EMV card sales stating, in pertinent part, as follows:

> During the six months ended June 30, 2015, ***we produced and shipped 75.2 million EMV cards, as compared to 13.9 million during the six months ended June 30, 2014.  During 2014, we produced and shipped 63.8 million EMV cards, as compared to 6.8 million during 2013.***  Of the 63.8 million EMV cards we shipped in 2014 (17.7% of the total Financial Payment Cards we shipped in 2014), over 50 million were shipped in the second half of 2014.  ***We believe that demand for EMV cards increased sharply in the second half of 2014 primarily as a result of, among other things, the impending Liability Shift and occurrence of high-profile data breaches. . . .  We anticipate that this trend will continue and that an increasing number and proportion of the Financial Payment Cards that we ship in the future will be EMV Cards***.

97.     The Registration Statement represented that CPI had experienced "***significant changes to our financial profile***" due to upgrade from magnetic stripe cards to EMV cards.  The Registration Statement stated, in pertinent part, as follows:

- Increased Net Sales—***The conversion of non-EMV cards to EMV cards has driven growth in our net sales because EMV cards have a higher selling price than comparable magnetic stripe cards***.

- Increased Cost of Goods Sold—The conversion of magnetic stripe cards to EMV cards also drove increases in our cost of goods sold as EMV cards include an integrated circuit chip assembly and may also include an RFID inlay assembly, in the case of a Dual-Interface EMV card, which meaningfully increased our cost of goods sold.

- Increased Gross Profit and Gross Profit Margin—***The conversion of magnetic stripe cards to EMV cards also drove an increase in our gross profit***, as the gross profit generated by an EMV card is higher than the gross profit generated by an otherwise comparable magnetic stripe card.  Likewise, ***the conversion of magnetic stripe cards to EMV cards resulted in an increase to our gross profit margins***.

- Increased Income from Operations and Operating Margin—The conversion of magnetic stripe cards to EMV cards drove an increase in our income from operations, as the increased operating expenses required to support the increased production of EMV cards was less than the incremental gross profit generated.  These factors drove an increase in our operating margin.

- Increased Working Capital Investment—The conversion of magnetic stripe cards to EMV cards resulted in increased investment in working capital, particularly accounts receivable and inventory.  This is a direct result of the increased levels of net sales and cost of goods sold discussed above.

- Increased Capital Spending and Depreciation—We incurred elevated levels of capital investment to prepare for the U.S.  EMV conversion, including investments in our network of facilities and technological infrastructure discussed above.  We anticipate spending up to an additional $10 million in capital investment during 2015 in connection with our further EMV preparation.  This will utilize cash from our operations and result in additional depreciation expense in future years.

98.     The Registration Statement detailed CPI's "Growth Strategy." Among other "key components," the Registration Statement stated that the U.S. EMV conversion would increase the size of the financial payment card market.  The Registration Statement stated, in pertinent part, as follows:

> ***Capitalize on U.S. EMV Conversion***.  The conversion to the EMV standard in the United States is expected to increase the size (measured in dollars) of the Financial Payment Card market (excluding services) from $180 million in 2013 to $1.2 billion by 2019, driven primarily by the increasing levels of card fraud in the United States, the Payment Card Brands' coordinated EMV conversion plan,

including the liability shift scheduled for October 1, 2015, and the need for a single global interoperable standard of card acceptance. ***The conversion of Financial Payment Cards in the United States from magnetic stripe technology to the EMV standard began in earnest in the second half of 2014 and is expected to continue over the next several years, with full adoption in the credit and bank debit card markets expected to be largely complete by 2017 and increasing levels of adoption of Prepaid Debit Cards and Private Label Credit Cards beyond 2017. We believe the conversion to EMV, and subsequently the expected further adoption of the more complex and higher priced Dual-Interface EMV cards, will increase the size (measured in dollars) of our estimated addressable card market by four times over the next decade.*** In anticipation of the EMV conversion, we invested significantly in our network of facilities (the most extensive in North America), technological infrastructure and human capital resources. We believe our comprehensive solutions offering and proven track record ideally positions us to be the customers' partner of choice to successfully complete the EMV conversion.

99.     The statements referenced above in ¶¶ 94-98 were each inaccurate statements of material fact because they failed to disclose and misrepresented the following material adverse trends and uncertainties that existed at the time of the IPO:

(a)     CPI's largest customers of EMV cards were significantly over-inventoried with EMV cards having increased purchases in the first half of 2015 far in excess of card issuance thereby resulting in a massive backlog of between 50 million to 100 million cards at those larger issuer customers, representing at least three months' worth of demand and between at least 23% and 47% of CPI's EMV card sales in the first half of 2015;

(b)     as a result of overstocking, CPI's largest customers would significantly reduce their purchases in the fourth quarter 2015 and fiscal year 2016, as they worked through their bloated inventories;

(c)     small and midsize issuers, which represented CPI's "core" market segment and "highest" market share, were not rapidly adopting EMV card technology thereby resulting in lack of demand for CPI's EMV card products; and

(d)      as a result of decreased EMV card demand from overstocked large issuer customers and lack of demand from small and midsize market customers that were not adopting EMV card technology, CPI was facing increased pricing pressure and competition in connection with obtaining EMV card orders.

> ### 2.      The Registration Statement Failed to Disclose and Misrepresented Significant Risks that Made the IPO More Speculative and Risky

100.    Item 3 of Form S-1 also required that the Registration Statement furnish the information called for under Item 503 of Regulation S-K, 17 C.F.R. § 229.503, including, among other things, a "discussion of the most significant factors that make the offering speculative or risky."

101.    The risk disclosures in the Registration Statement negligently failed to advise investors about significant, then-existing (as opposed to potential) factors that made the IPO more speculative or risky than the Registration Statement disclosed.

102.    Specifically, the Registration Statement inaccurately described as **_potential_**, certain risks associated with inventory management and levels, industry overcapacity, and competition, which "may in the future" have an adverse effect on its business, financial condition, and results of operations, rather than actual trends that had already manifested.  The Registration Statement stated, in pertinent part, as follows:

> ***Our operating results may vary significantly from quarter to quarter and annually, and may differ significantly from our expectations or guidance***.
>
> Our operating results are affected by a wide variety of factors that could materially and adversely affect revenues and profitability or lead to significant variability in our operating results. These factors include, among others, the cyclicality of the financial card and electronic payment industries, capital requirements, ***inventory management***, the availability of funding, ***competition***, new product developments, technological changes and production problems. For example, ***if anticipated sales or shipments do not occur when expected, expenses and inventory levels in a given quarter can be disproportionately high, and our***

*results of operations for that quarter, and potentially for future quarters, may be adversely affected*. In addition, our effective tax rate currently takes into consideration certain favorable tax rates and incentives which, in the future, may not be available to us.

A number of other factors could lead to fluctuations in quarterly and annual operating results, including:

- order cancellation or rescheduling by our customers;

       \*     \*     \*

- changes in distribution and sales arrangements; [and]

- the failure to win new projects[.]

       \*     \*     \*

Unfavorable changes related to certain of the above factors have in the past and any of the above factors *may in the future adversely affect our operating results. Furthermore, in periods of industry overcapacity or when our key customers encounter difficulties in their end-markets, orders are more exposed to cancellations, reductions, price renegotiations or postponements, which in turn reduce our management's ability to forecast the next quarter or full-year production levels, net sales and margins.  For these reasons, our net sales and operating results may differ materially from our expectations or guidance as visibility is reduced and have an adverse effect on our business, financial condition and results of operations.*

103.    The Registration Statement also inaccurately described as *potential*, certain risks associated with price erosion and pressure in the industry, which "could" have an adverse effect on its business, financial condition, and results of operations, rather than actual trends that had already manifested.  The Registration Statement stated, in pertinent part, as follows:

*The financial payment card industry may be subject to price erosion, which could have an adverse effect on our business*.

*One of the results of the rapid innovation in the financial payment card industry is that pricing pressure can be intense, in particular for large credit and debit card issuers and large card processors*.  Our large credit and debit card issuer customers face continued competitive pressure.  *As these issuers seek to reduce their expenses, we, in turn, may experience a decline in the prices at which our products can be sold and at which such services can be offered*.  In such instances, in order to continue to supply these products and services at

competitive prices, we must reduce our production costs.  Typically, we are able to accomplish this through leveraging our scale and production efficiencies. ***However, if we cannot continue to improve our efficiencies to a degree sufficient for maintaining the required margins, we may no longer be able to make a profit from the sale of these products and services***.  Moreover, we may not be able to cease production of such products, either due to our ongoing contractual obligations or the ***risk of losing our existing customer relationships***, and as a result may be required to bear a loss on such products.  Further competition in our core product and service markets may lead to price erosion, lower revenue growth rates and lower margins in the future.  ***Should reductions in our production costs fail to keep pace with reductions in market prices for the products we sell, there could be an adverse effect on our business, financial condition and results of operations.***

104.    The Registration Statement inaccurately described as ***potential***, certain risks associated with the emergence of lower-cost EMV card producers and increased competition, which "could" have an adverse effect on its business, financial condition, and results of operations, rather than actual trends that had already manifested.  The Registration Statement also stated, in pertinent part, as follows:

***We face competition that may result in loss of our market share and/or decline in our profitability***.

\*        \* \*

Some of our competitors have longer operating histories, and, when viewed globally, larger customer bases and significantly greater financial, sales and marketing, manufacturing, distribution, technical and other capabilities than we do.  ***These competitors may be able to adapt more quickly to new or emerging technological requirements and changes in customer and/or regulatory requirements. They may also be able to devote greater resources to the promotion and sale of their products and services***.  We also face competition from newly established competitors, suppliers of products and customers who choose to develop their own products and services.

\*        \* \*

***As the technological sophistication of our competitors and the size of the market increase, competing low-cost producers could emerge and grow stronger. If our customers prefer low-cost alternatives to our products, our revenues and profitability could be adversely affected***.  Increased competition has historically resulted in, and is likely to continue to result in, declining average selling prices and reduced gross margins in certain of our businesses and the loss

of market share in certain markets. *We may not be able to continue to compete successfully against current or new competitors. If we fail to compete successfully, we may lose market share in our existing markets, which could have an adverse effect on our business, financial condition and results of operations*.

105.    The Registration Statement inaccurately described as ***potential***, certain risks associated with a decline in business from CPI's large customers or CPI's failure to retain such customers, as well as increased competition and pricing pressure, which "may" have an adverse effect on its business, financial condition, and results of operations, rather than actual trends that had already manifested.  The Registration Statement further stated, in pertinent part, that:

> *Failure to identify, attract and retain new customers or a failure to maintain our relationships with our major customers could adversely affect our business.*
>
> Our business is dependent upon our ability to identify, attract and retain new customers and to maintain our relationships with our existing customers. *A decline in the business of our large customers or a failure to retain such customers may adversely affect our business, financial condition and results of operations*.
>
> A substantial portion of our net sales is derived from several large customers. Our top five customers as of December 31, 2014 accounted for approximately 33.9% of our pro forma net sales (37.8% of our reported net sales) for the year ended December 31, 2014, and our top customer accounted for approximately 10.1% of our net sales (11.3% of our reported net sales) for the same period. *Our continued business relationship with these customers, and the renewal of key contracts by major customers, may be impacted by several factors beyond our control, including more attractive product offerings from our competitors, pricing pressures or the financial health of these customers. Many of our key customers operate in competitive businesses, and their demand and market positions may vary considerably*. . . .
>
> *                *        * *
>
> *Therefore, we may not be able to maintain our market share with our key customers, which in turn could affect the revenue streams upon which we currently rely*.  Furthermore, there is no guarantee that we will be able to renew or win significant contracts in a given year.  If we were to lose important programs for our products with any of our key customers, or *if any key customer were to reduce or change its contract, seek alternate suppliers, increase its product returns* or become unable or otherwise fail to meet its payment

obligations, ***our business, financial condition and results of operations could be materially adversely affected.***

106.    The statements referenced above in ¶¶ 102-05 were each inaccurate statements of material fact because while noting only the ***potential*** negative impacts on its business, financial condition, and result of operations, the Registration failed to disclose and misrepresented the following significant, ***then-existing*** material adverse trends that CPI ***had already been*** facing at the time of the IPO:

(a)    CPI's largest customers of EMV cards were significantly over-inventoried with EMV cards having increased purchases in the first half of 2015 far in excess of card issuance thereby resulting in a massive backlog of between 50 million to 100 million cards at those larger issuer customers, representing at least three months' worth of demand and between at least 23% and 47% of CPI's EMV card sales in the first half of 2015;

(b)    as a result of overstocking, CPI's largest customers would significantly reduce their purchases in the fourth quarter 2015 and fiscal year 2016, as they worked through their bloated inventories;

(c)    small and midsize issuers, which represented CPI's "core" market segment and "highest" market share, were not rapidly adopting EMV card technology thereby resulting in lack of demand for CPI's EMV card products; and

(d)    as a result of decreased EMV card demand from overstocked large issuer customers and lack of demand from small and midsize market customers that were not adopting EMV card technology, CPI was facing increased pricing pressure and competition in connection with obtaining EMV card orders.

107.    The Registration Statement also inaccurately described as ***potential***, certain risks associated with lower than expected adoption rates for EMV technology, which "could" have an

adverse effect on CPI's business, financial condition, and results of operations, rather than actual trends that had already manifested.  The Registration Statement stated, in pertinent part, as follows:

> **The adoption of EMV technology and dual-interface capability in the United States may not be as rapid or widespread as we anticipate, which could adversely affect our growth.**
>
> We have made significant investments in our North American EMV production capabilities. In particular, in 2014, we opened a 50,000 square foot technology center in Colorado dedicated to EMV production and personalization and enhanced our EMV capabilities across our network. **Our ability to grow depends significantly on whether U.S. card issuing banks incorporate EMV technology as part of their new technological standards** and, following the initial conversion to EMV, whether such banks issue Dual-Interface EMV cards. Banks may be delayed in transitioning to the issuance of EMV cards or Dual-Interface EMV cards due to increased costs and other factors. **If these entities do not continue to deploy EMV and Dual-Interface EMV technology or deploy such technology less quickly and/or completely than we expect, the consequence could have an adverse effect on our business, financial condition and results of operations**.

108.    The statements referenced above in ¶ 107 were each inaccurate statements of material fact because while noting only the **potential** negative impacts on its business, financial condition, and result of operations, the Registration Statement failed to disclose and misrepresented the significant, **then-existing** material adverse trends that (i) small and midsize issuers, which represented CPI's "core" market segment and "highest" market share, were not rapidly adopting EMV card technology thereby resulting in lack of demand for CPI's EMV card products, and (ii) as a result of that lack in demand, as well of decreased EMV card demand from overstocked large issuer customers, CPI was facing increased pricing pressure and competition in connection with obtaining EMV card orders.

109.    The IPO was successful for the Company, the selling stockholders and the Underwriter Defendants who sold 17.25 million shares of CPI common stock, raising $172.5 million in gross proceeds (approximately $164 million net of underwriting fees and IPO costs).

Of that stock, CPI sold 15 million shares, receiving approximately $142.5 million in proceeds; the Tricor Fund Defendants sold 1,899,605 shares, receiving approximately $18 million in proceeds; Defendant Montross sold 87,991 shares, receiving $835,914 in proceeds; Defendant Pearce sold 22,758 shares, receiving $216,201 in proceeds; and Defendant Dreiling sold 19,941 shares, receiving $189,439 in proceeds.

110.    As of the filing of the initial complaint in this action, **CPI common stock traded at $4.70 per share—53% less than the $10 per share IPO price**.

### F.    Post-IPO Disclosures Reveal the Truth

111.    On November 12, 2015, just one month after the IPO, CPI issued a press release in which it announced its third quarter 2015 financial results.  Later that day, during the Company's first earnings conference call as a public company, CPI noted that "EMV demand from our large issuers was slightly higher than . . . expected and . . . represented a modest pull forward of business into the quarter."  In response to questions from analyst about the "pull forward" Defendant Montross claimed that the Company "ha[d]n't quantified it" but "just noticed that . . . that there was a modest very modest pull forward" of orders expected in the fourth quarter into the third quarter.

112.    This "very modest pull forward," meaning card orders that had been expected in the fourth quarter were placed by issuers in the third quarter, was in fact the tail end of a six month trend during which issuers were amassing a massive inventory of EMV cards that would take months to work through.

113.    Indeed, on a February 24, 2016 earnings conference call, in connection with the release of CPI's fourth quarter 2015 (the quarter during which the IPO occurred) and full fiscal year 2015 financial results, the Company disclosed that its larger issuer customers had actually increased purchases **throughout the first half of 2015—long before the IPO—far in excess of**

*card issuance*.  The resulting buildup of inventor with these customers would necessarily result in diminished demand for its products:  "After ***substantial purchases in the first half of 2015***, many of the large issuers ease their pace of EMV card purchases through the second half of the year as they began working toward catching up their EMV card issuance activity to their card purchases."  Based on the Company's "***reasonably good visibility in to the overall EMV demand***," Defendant Montross stated that this "dynamic" would "continu[e] into early 2016."

114.    On May 11, 2016, CPI issued a press release in which it announced its financial results for the first quarter 2016.  This press release finally quantified the extent of the massive overstocking that occurred prior to the IPO and slashed its fiscal year 2016 sales and earnings guidance on the basis of lower-than-expected demand for EMV cards.  Defendant Montross stated in the press release that:

> ***Based on discussions with customers and other market participants***, including chip suppliers, ***it has become clear that two separate adverse trends*** have developed in the U.S. EMV card market that will ***delay into 2017*** the anticipated growth in sales of EMV cards by the card manufacturers to the card issuers.  ***First, the carryover into 2016 of unissued EMV card inventories at the large issuers and processors is much greater than anticipated, and accordingly, their EMV card purchases are being curtailed until inventories return to normal levels.  Second, we are seeing evidence of slower than anticipated EMV conversions for the small to mid-sized issuers at the processor level, which leads us to expect a delay to 2017 of a portion of EMV card demand by this market segment that we had expected in 2016.***  As a result of these trends, we are reducing our full-year 2016 guidance range.

115.    During an earnings conference call that same day, Defendant Montross again acknowledged that its large issuer customers are holding excess inventory, which has significantly reduced demand for the Company's products:

> [T]he overstocking of EMV cards by the large issuers and processors in 2015, which we discussed in the previous earnings call as the reason for our outlook of a relatively soft first half of 2016 for EMV sales, is now known to be much greater than previously understood.

- 33 -

*The carryover of unissued EMV card inventories into 2016 by the large issuers and processors, which is now estimated to have been an additional 50 million to 100 million units or about 8% to 16% of total EMV card production demand in 2016*, has left many large issuers and processors with *at least three-month supply of excess inventory*, and in some cases, more.

The issuers and processors are now working through their excess card inventory position and *have been curtailing their purchases of additional EMV cards*.  We *expect this trend to continue* until the large issuers and processors right-size their EMV card inventories.  *We estimate that the negative revenue impact to CPI in 2016 from this reduction in current card demand will be approximately $35 million to $40 million* compared to our original guidance for 2016.  We believe that the impact will be highest in the second quarter, with less impact in the third quarter, and then sequentially less impact in the fourth quarter.

116.    The revelation that EMV card inventories were overstocked by 50 million and 100 million unissued cards was startling because, given CPI's 35% market share, it represented at least 23% of CPI's total EMV card sales in the first half of 2015 at the low end and 47% at the high end.

117.    Defendant Montross also expanded on lack of demand from the small and midsize issuer segment due to their failure to adopt EMV technology by stating:

*[T]he small to mid-size issuer segment of the market, which represents over 35% of the financial payment card market and where we have our highest market share, is experiencing delays in the conversion to EMV*.  As a first step in EMV issuance, the processor for the issuer must set up the issuer's accounts to process EMV transactions and must do extensive testing of the processors.  Also, the process to configure and test the EMV cards to be issued by the bank is an additional technical and time-consuming process.  *The slower-than-anticipated case of the EMV conversions for the small to mid-size issuers is expected to delay to 2017 a significant portion of EMV card demand from this market segment.  We currently estimate that the impact to CPI from this deferral of EMV demand of future periods by the small to mid-size issuers will be to reduce our 2016 revenues by approximately $35 million to $40 million compared to original guidance*.

118.    Defendant Montross and Brush then both revealed that the overstocking of EMV cards by large issuers and the failure of small and midsize issuers to adopt EMV technology had

created "increased competitive intensity for the EMV card orders" and was "driving greater than expected pricing pressure for those EMV card programs that are now being executed."

119.    The Company reduced its fiscal year 2016 guidance for these reasons.

120.    On this news, the price of CPI's stock plummeted, falling from an opening price of $7.83 per share on May 11, 2016 to close at $4.01 per share on May 12, 2016.

## V.    CLASS ACTION ALLEGATIONS

121.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased or otherwise acquired CPI common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

122.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class as the Company offered over 17 million shares of common stock in the IPO.  Record owners and other members of the Class may be identified from records maintained by CPI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

123.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

124.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

125.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

　　　　(a)     whether Defendants violated the Securities Act;

　　　　(b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

　　　　(c)     to what extent the members of the Class have sustained damages, and the proper measure of damages.

126.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.     CAUSES OF ACTION

**COUNT I**
**FOR VIOLATIONS OF § 11 OF THE SECURITIES ACT**
**(Against the Company, the Individual Defendants, and the Underwriter Defendants)**

127.     Lead Plaintiff incorporates ¶¶ 1-126 by reference.

128.     This cause of action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77*k*, on behalf of the Class, against Defendant CPI, each of the Individual Defendants, and each of the Underwriter Defendants.  Lead Plaintiff does not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This claim is based solely on negligence and/or strict liability.

129.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

130.     Defendant CPI is the registrant for the IPO.  As such, CPI is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.  By virtue of the Registration Statement containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, CPI is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

131.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omission of any material facts and were not misleading.

132.     The Individual Defendants each signed the Registration Statement either personally or through an attorney-in-fact and/or caused its issuance.  The Individual Defendants each had duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading.  By virtue of each of the Individual Defendants' failure to

exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

133.    Each of the Underwriter Defendants as an underwriter of the securities offered in the IPO pursuant to and/or traceable to the Registration Statement had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement.  They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading.  By virtue of each of the Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading.  As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

134.    None of the untrue statements or omissions of material fact in the Registration Statement alleged herein was a forward-looking statement.  Rather, each such statement concerned existing facts.  Moreover, the Registration Statement did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

135.    By reason of the conduct herein alleged, each Defendant named in this Count violated, and/or controlled a person who violated, Section 11 of the Securities Act.

136.    Lead Plaintiff acquired CPI common stock traceable to the IPO.

137.     Lead Plaintiff and the Class have sustained damages.  The value of CPI common stock has declined substantially subsequent to and due to the violations of each Defendant named in this Count.

138.     At the time of their purchases of CPI common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Lead Plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Lead Plaintiff commenced this action.

### COUNT II
### FOR VIOLATIONS OF § 15 OF THE SECURITIES ACT
#### (Against the Individual Defendants and the Tricor Fund Defendants)

139.     Lead Plaintiff incorporates ¶¶ 1-138 by reference.

140.     This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77*o*, on behalf of the Class, against each of the Individual Defendants and each of the Tricor Fund Defendants.  Lead Plaintiff does not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This claim is based solely on negligence and/or strict liability.

141.     Each of the Tricor Fund Defendants, by virtue of their stock ownership, their Board designees constituting a majority of the CPI's Board of Directors, and their own admissions in the Registration Statement, controlled CPI and each of the Individual Defendants at the time of the IPO.

142.    Each of the Tricor Fund Defendants participated in the preparation and dissemination of the Registration Statement, and otherwise participated in the process necessary to conduct the IPO.  Because of their position of control and authority as controlling stockholders and their position as selling stockholders in the IPO, each of the Tricor Fund Defendants were able to, and did, control the contents of the Registration Statement, which contained materially untrue information and/or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

143.    The Individual Defendants were each a control persons of CPI by virtue of their positions as directors and/or senior officers of CPI.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major stockholders of CPI, including the Tricor Fund Defendants.

144.    Each of the Individual Defendants participated in the preparation and dissemination of the Registration Statement, and otherwise participated in the process necessary to conduct the IPO.  Because of their positions of control and authority as senior officers and/or directors and, as for Defendants Montross, Dreiling, and Pearce, their position as selling stockholders in the IPO, each of the Individual Defendants were and able to, and did, control the contents of the Registration Statement, which contained materially untrue information and/or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

145.    As control persons of CPI, each of the Individual Defendants and each of the Tricor Fund Defendants are liable jointly and severally with and to the same extent as CPI for its violation of Section 11 of the Securities Act.

## VII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for judgment as follows:

(a)     Determining that this action is a proper class action, certifying Lead Plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiff and the other Class members their reasonable costs and expenses incurred in this action, including attorneys' fees, accountants' fees, and experts' fees, and other costs and disbursements; and

(d)     Awarding Lead Plaintiff and the other Class members such other relief as the Court may deem just and proper.

## VIII.   <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury of all issues so triable.


DATED:  October 17, 2016

LABATON SUCHAROW LLP


By:  <u>*/s/ Michael W. Stocker*</u>
Joel H. Bernstein
Michael W. Stocker
Alfred L. Fatale III
Ross M. Kamhi
140 Broadway
New York, New York  10017-5563
Telephone:    (212) 907-0700
Facsimile:    (212) 818-0477
jbernstein@labaton.com
mstocker@labaton.com
afatale@labaton.com
rkamhi@labaton.com

*Lead Counsel for Lead Plaintiff*
*and the Class*