UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- x

In re:

CPI CARD GROUP INC. SECURITIES LITIGATION — 16-cv-4531 (LAK)

---------------------------------------- x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____
DATE FILED: 10/30/17

**MEMORANDUM OPINION**

Appearances:

Alfred Louis Fatale, III
Eric David Gottleib
Joel H. Bernstein
Michael Walter Stocker
Ross Michael Kamhi
LABATON & SUCHAROW LLP
*Attorneys for Plaintiff*

Phillip C. Kim
THE ROSEN LAW FIRM P.A.
*Attorney for Brett Rosenfarb*

Lesley Frank Portnoy
GLANCY PRONGAY & MURRAY LLP
*Attorney for Steve Bostic and Waltraud Buchanan*

Peretz Bronstein
BRONSTEIN, GEWIRTZ & GROSSMAN
*Attorney for John Lorge, Paul Costanzo Jr., Kenyon Riches, and John P. Hodges, Jr.*

Kim Elaine Miller
KAHN SWICK & FOTI, LLC
*Attorney for Dean Hiser*

Jeffrey Philip Campisi
KAPLAN FOX & KILSHEIMER LLP
*Attorney for Thomas C. Swieringa*

Thomas Livezey Laughlin, IV
SCOTT SCOTT, L.L.P.
*Attorney for Shannon Wayne Myers and Vida Myers*

Carl Zank
*Pro Se*

James P. Smith, III
DEWEY & LEBOEUF, L.L.P.
Matthew Lawrence DiRisio
WINSTON & STRAWN LLP
*Attorneys for Defendants CPI Card Group, Inc., Steven Montross, David Brush, Jerry Dreiling, Bradley Seaman, Nicholas Peters, Robert Pearce, David Rowntree, Tricor Pacific Capital Partners (Fund IV) US, Limited Partnership, and Tricor Pacific Capital, Inc.*

Adam Selim Hakki
Agnes Dunogue
SHEARMAN & STERLING LLP
*Attorneys for Defendants BMO Captial Markets Corp., Goldman, Sachs & Co., CIBC World Markets Inc., Robert W. Baird & Co. Incorporated, William Blair & Company, L.L.C., Raymond James & Associates, Inc., Scotia Capital (USA) Inc., and Griffiths McBurney Corp.*

LEWIS A. KAPLAN, *District Judge.*

This case arises out of statements made in connection with CPI Card Group's initial public offering ("IPO") of October 15, 2015.[1] The Consolidated Complaint alleges violations of Sections 11 and 15 of the Securities Act.[2] Defendants moved to dismiss the complaint for failure to state a claim upon which relief may be granted.[3] For the following reasons, the motion is denied.

## *Background*

### *I. CPI's Business and the "Liability Shift"*

Credit and debit cards traditionally carried encoded data that facilitated transactions in a magnetic stripe on the backs of the cards. Liability for fraudulent card activity fell on the card issuers.

With the passage of time, it became possible to issue new, presumably more secure, "chip," or "EMV," cards[4] that carry encoded information on embedded chips. Effective October 1, 2015, liability for fraudulent activity shifted to merchants and away from card issuers when (a) the latter made "chip" or "EMV" cards available to their customers and (b) fraudulent transactions took place with merchants that did not adopt the technology needed to read the new cards.[5]

---

1. The Registration Statement, the contents of which are at issue, was filed on May 14, 2015 and declared effective by the SEC on October 8, 2015. DI 109 ¶¶ 77-78.

2. DI 109.

3. DI 110.

4. "EMV" is short for "Europay, Mastercard, and Visa," and refers to chip cards. *Id.* at ¶ 4.

5. *Id.* at ¶ 60.

CPI manufactures and sells credit and debit card blanks to banks and other card issuers as part of its business. The 2015 liability shift was a boon to it because it drove card issuers to convert to chip cards, which required the issuers to buy new card blanks from CPI and other suppliers. Business started booming in the second half of 2014 as issuers began to replace their customers' traditional cards with chip cards.[6] CPI, based on an industry consultant's estimates, expected its business to grow from $976 million in 2015 to $1.2 billion in 2019.[7]

## *II. The IPO and the Months Following*

### *a. October and November 2015: The IPO and a Sales Increase in Third Quarter 2015*

On October 15, 2015, CPI conducted an IPO of around $137.5 million of common stock. When CPI announced its third quarter results on November 12, 2015, earnings-per-share were higher than analysts' predictions, and net sales were up from 2015.[8] During a conference call that same day, CPI chief executive officer David Montross said that the third quarter earnings "represented a modest pull forward" of chip card business from the fourth quarter into the third.[9]

### *b. February 2016: Sales Are Down in Fourth Quarter 2015*

Then, on February 24, 2016, CPI announced its fourth quarter and 2015 year-end

---

6 *Id.*

7 DI 111-1, at ECF p. 102.

8 DI 109 ¶ 32; DI 112, at ECF p. 17.

9 DI 109 ¶ 111.

results.[10] Chip card sales during the fourth quarter were down, which was consistent with CPI's expectations following the pull forward in the quarter previous.[11] Montross said during the earnings call that large card issuers were "eas[ing] their pace of EMV card purchases through the second half of the year" to work through pre-existing card inventory because they had made "substantial purchases in the first half of 2015."[12] He predicted that "this dynamic" – large card issuers slowing purchases as they worked through pre-existing inventory – would continue into early 2016; that CPI nevertheless would meet expected growth predictions for 2016 based on its "reasonably good visibility into the overall EMV demand by large issuers;" and that large issuers' purchases of chip cards would be "weighted to the second half of [2016]."[13]

*c. May 2016: First Quarter 2016 Sales Are Down and a Trend Is Announced*

CPI announced its first quarter 2016 results on May 11, 2016.[14] They were below expectations. In a press release describing the quarter's results, CPI announced two trends that were causing it to reduce its guidance range for 2016. "First, the carryover into 2016 of unissued EMV card inventories at the large issuers and processors is much greater than anticipated, and accordingly, their EMV card purchases are being curtailed until inventories return to normal levels. Second,

---

10 *Id.* at ¶ 113.

11 *Id.*; DI 111-8, at ECF p. 4.

12 DI 111-8, at ECF. p. 4.

13 *Id.* at ECF p. 5.

14 DI 109 ¶ 114; DI 111-9, at ECF p. 6.

. . . evidence of slower than anticipated EMV conversions for the small to mid-sized issuers . . . leads us to expect a delay to 2017 of a portion of EMV card demand . . . that we had expected in 2016."[15]

Montross explained more about these trends in an earnings call the same day. Large issuers' "overstocking" of chip cards during 2015, he said, was "much greater than previously understood," with many issuers in possession of at least a three month supply of excess inventory.[16] He noted the other trend – small- to mid-sized issuers' delayed conversion to chip cards – without much explanation.[17] He predicted also that these trends would lead to a reduction in demand of $35 to $40 million from the original 2016 guidance range.[18] Finally, he alerted investors to "increased competitive intensity for the EMV card orders . . . leading to greater than expected pressure on EMV card prices in the large issuer market."[19]

CPI's stock, which had opened at $7.83 per share on May 11, closed at $4.01 per share on May 12.[20]

## *III. This Litigation*

---

15 DI 111-9, at ECF p. 6.

16 DI 111-10, at ECF p. 4.

17 DI 109 ¶ 115; DI 111-10, at ECF p. 4.

18 DI 111-10, at ECF p. 4.

19 *Id.*

20 DI 109 ¶ 120.

The plaintiffs here allege that the defendants violated Sections 11 and 15 of the Securities Act of 1933 by publishing a misleading registration statement in connection with CPI's October 15, 2015 IPO.[21] Defendants moved for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure based on what they contend is plaintiffs' failure to state a claim upon which relief may be granted.[22]

*Discussion*

"Sections 11 . . . and 15 of the Securities Act impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions."[23] One such actionable omission is the failure to disclose a "material fact required to be stated."[24] Section 11 creates strict liability for issuers and signatories of a registration statement and negligence liability for underwriters.[25]

---

21 *Id.* at ECF p. 4.

22 DI 112.

23 *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010).

24 15 U.S.C. § 77k(a).

Section 15 creates liability for certain "control persons" when a person or entity whom the control person actually controls commits a primary violation of Section 11 or 12(a)(2) of the Security Act. *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 716, 720 (S.D.N.Y. 2013). Defendants argue for dismissal of the Section 15 claims based solely on plaintiffs' alleged failure to plead a primary violation of Section 11. DI 112, at ECF pp. 42-43. Section 15 therefore need not be discussed in detail.

25 *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).

Item 303 of Regulation S-K requires that a registration statement "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."[26] A registrant therefore violates Section 11 if the registrant fails to disclose information required by Item 303, as Section 11 forbids the omission of facts "required to be stated."[27]

Plaintiffs present many theories of liability. At least one – that defendants violated Section 11 by failing to disclose known trends as required by Item 303 – is plausible. Defendants' motion therefore is denied.

## *I. Section 11*

Although Section 11 creates strict liability for violations of its requirements, Item 303 requires disclosure only of *known* trends and uncertainties.[28] Defendants argue that plaintiffs pleaded neither the existence of a trend nor CPI's pre-IPO knowledge of any trend that in fact existed.[29] Without a known trend, defendants argue, there was no Item 303 violation and thus no Section 11 violation.

---

26 17 C.F.R. § 229.303(a)(3)(ii).

27 15 U.S.C. § 77k(a); *see Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011).

28 C.F.R. § 229.303(a)(3)(ii).

29 DI 112, at ECF pp. 25-33. Defendants do advance other arguments for dismissal, such as an argument that defendants' risk disclosure statements shield it from liability. DI 112, at ECF p. 22. The Court has considered and rejects those arguments as well.

The Court disagrees with defendants' arguments. Because plaintiffs are proceeding under strict liability and negligence theories, rather than asserting fraud, the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act do not apply.[30] Plaintiffs' burden is to plead facts from which the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged."[31] They have done so.

*a. The Existence of a Trend*

Plaintiffs adequately have pleaded the existence of a trend at the time of the registration statement's filing. Specifically, they have pleaded that, "at the time of the IPO, CPI's largest customers for EMV cards were significantly over-inventoried because during the first half of 2015 they purchased more cards than they were issuing."[32] This trend – large issuers buying more cards than they needed immediately, thus accumulating backlogs – initially caused a "spectacular rise in sales."[33] But the other shoe dropped after the IPO. Sales slowed as large issuers worked through the backlogs they had accumulated prior to the IPO.[34]

Plaintiffs' complaint is full of specific facts that support the existence of the trend

---

30 *Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir. 2004).

31 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

32 DI 109 ¶ 81.

33 *Id.*

34 *Id.*

they allege: pre-IPO overstocking of chip cards. For example, plaintiffs point to Montross's statements in February 2016 blaming the disappointing first quarter 2016 sales results on an accumulation of inventory by large issuers in 2015.[35]

Defendants argue that plaintiffs have not sufficiently pleaded the existence of a trend, but their argument simply recharacterizes the trend at issue as the post-IPO sales drop-off.[36] They then argue that the trend as they characterize it – a drop-off in sales – did not exist before the IPO. That is true, but beside the point. The trend plaintiffs allege is a pre-IPO overstocking of chip cards, and so defendants' argument fails. Defendants argue also that in fact there was no trend. There was only an "isolated occurrence," the disclosure of which Item 303 did not require.[37] But whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage.[38]

---

35 *Id.* at ¶ 113.

36 DI 112, at ECF p. 26 (describing the pleaded trend as "the unexpected reduction in demand and sales").

37 *Id.* at ECF p. 27.

38 Cases cited by the defendants do not support their argument. In *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015), the court did *not* find that a five-month period was insufficient to establish a trend. Rather, the court said that "[e]ven inferring in plaintiffs' favor that the longer five-month period could constitute a trend, the complaint merely alleges, in a conclusory fashion, that defendants had knowledge of this trend." *Id.* As discussed *infra*, plaintiffs here do plead knowledge adequately. The other cases cited refer to occurrences that were "almost contemporaneous with the IPO" or that lasted two months only; plaintiffs here allege that the trend began in the first half of 2015, making it much longer than two months. *In re Coty*, No. 14-cv-919, 2016 WL 1271065, at *7 (S.D.N.Y. Mar. 29, 2016); *In re Noah Educ. Holdings*, No. 08-cv-9203, 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 13, 2014).

*b.* *A Known Trend*

Defendants argue that even if plaintiffs pleaded the existence of a trend, they failed to plead that CPI knew of the trend before the IPO, as Item 303 requires.[39] But plaintiffs have pleaded specific facts that, at least when taken as a whole, raise a plausible inference that CPI knew of the trend before the IPO.

The complaint includes four types of specific, factual allegations that, at least together, support an inference of pre-IPO knowledge: (1) the temporal proximity of the IPO and the sales drop-off, (2) Montross's statements from the November 2015 and February 2016 earnings calls, (3) statements about customer relationships and inventory-tracking capabilities, and (4) the claims of one confidential witness.

First, the timing of the IPO and the trend's manifestation supports an inference of pre-IPO knowledge.[40] The IPO was in October 2015. In February 2016 CPI announced a slowdown of sales that it attributed to issuers' prior overstocking of card inventory. The fact that CPI admitted its awareness of the trend so soon after the IPO, while certainly not dispositive, supports a claim of pre-IPO knowledge.

Next, Montross's statements during the November 2015 and February 2016 earnings calls further support plaintiffs' claim of pre-IPO knowledge. In the November 2015 call, Montross noted that CPI's third quarter 2015 sales exceeded expectations because of a "modest pull forward"

---

39 DI 112, at ECF p. 29.

40 *See In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 528 (S.D.N.Y. 2009).

of sales from the fourth quarter into the third.[41] It is reasonable to infer from this statement that, if CPI could detect a "modest pull forward" of sales one month after the IPO, they were able to and did detect a "pull forward" prior to the IPO as well. This is particularly so because Montross said in the February 2016 call that CPI had "reasonably good visibility" into the buying practices of large issuers, a statement that further supports the inference that CPI knew that large issuers were accumulating card backlogs.[42] By CPI's own admission, it was able to know these sorts of things.

Similarly, the registration statement touted CPI's "long-standing trust-based relationships" and "deep process and technology integration" with its "key customers."[43] And plaintiffs discuss in the complaint CPI's "enterprise resource planning" software, Monarch.[44] These facts support an inference that CPI had pre-IPO knowledge of the trend by demonstrating CPI had resources that would have alerted it to the trend.[45]

Finally, the complaint includes the alleged statements of a confidential witness who

---

41 DI 109 ¶ 111.

42 *Id.* at ¶ 113.

43 *Id.* ¶ 43.

44 *Id.* at ¶ 67.

45 *Panther Partners, Inc. v. Ikanos Communications, Inc.*, 538 F Supp. 2d 662, 670 (S.D.N.Y. 2008), is not to the contrary. The court there said that a company has no general duty to track its customers' inventories and that the plaintiffs failed to explain "why or how the Defendant should have known" about its customers' accumulation of an inventory backlog. *Id.* Here, on the other hand, plaintiffs have pleaded why and how CPI knew that its customers were accumulating a backlog: its customer relationships and enterprise-planning software. These facts then support an inference of pre-IPO knowledge.

was an inventory analyst at CPI before, during, and after the IPO.[46] The witness supposedly said that CPI had accumulated "millions upon millions" of cards before the IPO; that the company's vault had to be expanded just as the IPO was happening to accommodate inventory that could not be sold; and that it was "obvious" that CPI was producing more cards than it was selling.[47] Of course, the parties dispute what this means.[48] Plaintiffs infer from these statements that CPI was making more cards than it was able to sell even before the IPO and therefore must have known of the overstocking trend. Defendants' preferred narrative is that CPI was overproducing cards out of a sense of optimism and to expand to accommodate its expected growth. But at the motion to dismiss stage, all inferences must be drawn in the plaintiffs' favor. It is reasonable to infer from the alleged statements of the confidential witness that CPI had pre-IPO knowledge of the trend. This, combined with the other facts discussed above, supports a plausible inference of knowledge.

Plaintiffs allege facts that make it plausible that CPI knew of a trend, the disclosure of which Item 303 required. Because CPI did not include information about the trend in its Registration Statement, plaintiffs have pleaded a violation of Section 11.

*II. Section 15 Claims*

Defendants' argument for dismissal of the Section 15 claims is based solely on their

---

46 DI 109 ¶ 82.

47 *Id.* at ¶¶ 84-87.

48 *Id.*

argument that plaintiffs failed to plead an underlying Section 11 violation.[49] The Court disagrees with the defendants regarding the Section 11 claim. Defendants offer no other reasons for dismissal of the Section 15 claim, and the Court finds none.

*Conclusion*

For the reasons stated above, defendants' motion to dismiss [DI 110] is denied.

SO ORDERED.

Dated: October 27, 2017

/s/ Lewis A. Kaplan

Lewis A. Kaplan
United States District Judge

---

49 DI 112, at ECF pp. 34-35.